## BROWN LUMBER CO., Inc., v. COMMISSIONER OF INTERNAL REVENUE. (No. 4849.)

Court of Appeals of District of Columbia. Argued October 16, 1929. Decided November 4, 1929.

William Cogger, of Washington, D. C., and Jacob S. Seidman, of New York City, for appellant.

Mabel W. Willebrandt, Asst. Atty. Gen., and C. M. Charest, V. J. Heffernan, Sewall Key, R. C. Shaw, and Donald V. Hunter, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice. Appeal from a decision of the Board of Tax Appeals involving the question whether title to certain lumber had passed to appellant in ·1920; the lumber having been ordered under an f. o. b. contract and no delivery having been made during the year.

The facts as found by the Board of Tax Appeals are not in dispute, and are substantially as follows: Appellant, the Brown Lumber Company, since its organization in 1909, has been engaged in the business of buying, selling, and producing lumber and lumber products. On February 10, 1920, appellant entered into a verbal agreement with the White Marble Lime Company (hereinafter called the lime company) for the purchase of 4,000,000 feet of box lumber; the agreement was confirmed under the same date, as follows:

"White Marble Lime Co., Manistique, Mich. Attention Mr. W. B. Thomas. My dear Mr. Thomas: Confirming the writer's conversation with you. You may enter our order for four million feet of box lumber sawed from 8′ bolts and edged on one edge,

price $35.00 per M' on board cars Manistique, Mich. Each party to pay ½ inspection fees; terms 2% off 15 days for cash or sixty days note from date of invoice.

"If sixty days is taken, invoice is to be settled promptly by Trade Acceptance. Orders to be given for shipment when shipping dry or settle for on estimate and piles marked up. You are to saw the lumber into 4 5 6 or 8/4 as we may direct. It is understood that this lumber is to be sawed this season by you, unless you are prevented doing so by accidents, strikes, fires or other conditions beyond your control.

"We are writing this in duplicate and the signing of the same constitutes a contract.

"Very truly yours,

"Brown Lumber Company,

"[Signed] By W. W. Parr.

"White Marble Lime Company,

"[Signed] By W. B. Thomas, Mgr."

On September 16, 1920, the lime company addressed a communication to appellant, in part as follows: "* * * Referring to the contract of date February 10th. We will not be enabled to furnish four million feet due to the strike conditions whereby we were not enabled to start our mill until late in July, whereas at the time of making the contract, I expected to start in April. * * * Owing to the labor conditions and strike which are beyond our control, I would estimate that our 1920 cut will be in the neighborhood of 2½ million feet. You understand this is simply an estimate as I do not know what the conditions from now to January first will be. * * *"

Mr. Parr, the president and general manager of appellant, made an inspection from time to time of the lumber covered by the contract, including "an inspection on or immediately before December 31, 1920." He found that the lumber purchased under the contract had been placed in pile and was marked in accordance with the trade custom as being sold to appellant.

On December 30, 1920, appellant wrote the lime company as follows:

"We would like to have you mail us a blanket invoice for the box lumber that we have on order from you.

"Enclosed you will find a Memo of the charge that we have put through our books. Understand we are taking a loss of $10.00 per M on this stuff on our inventory and we wish to have an invoice as a matter of record.

"When the stock comes out it can be invoiced and checked against this Memo invoice and when the stock is all cleaned up final settlement can be made.

"This blanket invoice should be dated not later than December 31st, 1920."

On January 5, 1921, the lime company replied to the letter of December 30th, as follows:

"As per your request, we are enclosing invoice for lumber.

"When shipments are made, invoices will be rendered and checked against this blanket invoice."

The requested invoice inclosed in the communication was as follows:

Invoice from White Marble Lime Company, Manistique, Michigan.

December 23, 1920.

Our Order No. ——
Your Order No. ——
Terms:—

To Brown Lumber Co., Traverse City, Mich.

| | | | | | | |
|---|---|---|---|---|---|---|
| 607,893' 4/4 | Box and Crating Lumber at $35 | | | | $21,276 | 26 |
| 415,872' 5/4 | " | " | " | " at $35 | 14,555 | 52 |
| | | | | ....... | 24,196 | 52 |
| 302,100' 8/4 | " | " | " | " at $35 | 10,573 | 50 |
| 2,017,194' | | | | | $70,601 | 80 |

This invoice was entered upon the books of appellant as a liability as of December 31, 1920. The value of the invoiced lumber then in the yard of the lime company was included in appellant's inventory of December 31, 1920, at $50,429.85, which was the fair market value of the lumber on that date.

Under date of February 26, 1921, the lime company addressed a communication to appellant as follows:

"Attached you will find estimate of lumber in pile cut in the months of July, August and September.

"I have with-held asking for settlement on any of this lumber appreciating your condition. But it has now come to a point where I must have funds to take care of camp labor orders, and I will be obliged if you will send us trade acceptances to the amount of $15,000.00 to be made in amounts of $2,500.00 each. Lumber to cover to be marked up with your name.

"I would be obliged if these would reach me by return mail."

The difference between the cost of the lumber in pile in the yard of the lime company as of December 31, 1920, $70,601.80, and the market value thereof, $50,429.85, was claimed by appellant in its income tax returns in 1920 as a deductible loss. This claim was disallowed by the Commissioner, and his decision was affirmed by the Board.

The lumber covered by the above invoice and in pile at the yard of the lime company on December 31, 1920, was charged to appellant and received and accepted by it from time to time during 1921 and 1922. In August, 1921, appellant "prevailed upon the

White Marble Lime Company to adjust the contract price to $16.25 per M ft. of lumber. All the shipments from lumber in pile on December 31, 1920, were settled on that basis."

■ Counsel for appellee contends that "the decision of the Board of Tax Appeals complained of in this appeal was upon an issue of fact, which this court lacks jurisdiction to review," and in support of the contention cites our opinion in Henderson Iron Works & Supply Co. v. Blair, 58 App. D. C. 114, 25 F.(2d) 538, 539. In that case this court pointed out that the record contained certain testimony which doubtless was heard by the Board, but which was not verified either by stipulation or bill of exceptions. After stating that the issue in the case was one of fact on which the burden of proof rested upon the taxpayer, and that the only evidence introduced to prove that fact was the testimony of one witness whose testimony "was so indefinite as to justify the Board's decision against appellant," the Court observed: "Moreover a decision of the Board of Tax Appeals, when based upon testimony taken at the trial of an issue of fact, should not be reversed by an appellate court because of a difference of opinion as to the mere weight of the evidence." In the present case, as already observed, the facts are not in dispute. We are concerned here merely with the legal effect of those facts; that is, whether under those facts the title to the invoiced lumber had passed to appellant on or before December 31, 1920. Clearly, we not only have jurisdiction, but it is our duty to determine this question.

Counsel for appellant, in a scholarly and helpful brief, concedes that the contract under consideration "is admittedly one 'to sell' rather than 'of sale' "; that "it also clearly involves 'unascertained or future goods' "; and that, "as to such contracts, the statute (the Uniform Sales Act of Michigan, where the contract was entered into and performed) provides among other things, and in effect, that *unless a different intention appears,* where the delivery terms are F. O. B., title passes when the property involved is delivered free on board." Counsel then cites section 19, rule 4(1), Uniform Sales Act, Michigan Laws of 1913, No. 100, p. 148, 3 Compiled Laws of Michigan 1915, p. 4211, § 11850, reading as follows: "Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer. Such assent may be expressed or implied, and may be given either before or after the appropriation is made."

■ After all, the actual intent of the parties must be determined from the terms of the contract, the conduct of the parties, and all the circumstances of the case. The contract here involved required the seller to saw and pile lumber of the required dimensions. When the lumber was sufficiently dry, orders were "to be given for shipment" by the purchaser. Whereupon it became the duty of the seller to put the lumber on board cars at Manistique, when the title would pass from the seller to the buyer. United States v. Andrews, 207 U. S. 229, 28 S. Ct. 100, 52 L. Ed. 185; Yockey v. Norn, 101 Mich. 193, 60 N. W. 685, 26 L. R. A. 145; Dow Chemical Co. v. Chemical Works, 208 Mich. 157, 175 N. W. 269, 14 A. L. R. 1200.

In the event of a failure of the purchaser to order shipment when the lumber became sufficiently dry, the contract required settlement to be made by the purchaser on the estimate of the lumber in piles on the seller's premises, and the piles then were required to be "marked up"; that is, marked with appellant's name. Undoubtedly title to lumber thus settled for and marked would pass to the purchaser, but this did not occur, because no lumber was settled for in 1920, nor was any shipped in 1920. Lumber was sawed and piled during the year, and Mr. Parr, president and general manager of the appellant company, "made inspection of the lumber covered by the contract from time to time. He made an inspection on or immediately before December 31, 1920. In this inspection he found that the lumber purchased under the contract * * * had been placed in pile and was marked in accordance with the trade custom as being sold to the Brown Lumber Company." It will be observed that the purpose and extent of this inspection is left to conjecture. Manifestly we may not assume that the inspection went further than the ascertainment of the quality of the lumber and the manner in which it had been sawed. Certainly there is nothing to indicate any waiver on the part of the seller of the requirement that lumber not seasonably ordered should be settled for on estimate. It is, we think, plain that there was no transfer of title by the mere inspection of piled lumber and the notation on the piles that it had been sold to appellant. That the parties did not understand that it had been

"unconditionally appropriated to the contract" is manifest from what followed.

Nothing further was done until December 30th, when appellant requested "a blanket invoice for the box lumber *that we have on order from you.*" (Italics ours.) The purpose of this request was stated to be that appellant wished "to have an invoice as a matter of record" so that *its books might disclose* "a loss of $10.00 per M on this stuff." The request closed with the statement that "this blanket invoice should be dated not later than December 31st, 1920." The invoice was not forthcoming until January 5, 1921, but it was postdated as of December 23, 1920.

On February 26, 1921, the lime company in a communication addressed to appellant, and notwithstanding the invoice, said: "Attached you will find estimate of lumber in pile cut in the months of July, August and September;" that the lime company had theretofore "withheld asking for settlement on *any* of this lumber"; that the lime company needed funds, and would be "obliged if you would send us trade acceptances to the amount of $15,000.00 to be made in amounts of $2,500.-00 each. *Lumber to cover to be marked up with your name.* (Italics ours.) In our view, this communication demonstrates that the seller still regarded the title to the lumber as not having passed to the purchaser. The words, "lumber to cover to be marked up with your name," are inconsistent with any other theory. In other words, the lime company recognized that the title to this lumber had not passed, and proposed that, to the extent that appellant would comply with the terms of the contract requiring it to "settle for on estimate," lumber to cover would be marked up with appellant's name, when title to that lumber would thereupon pass to appellant. It does not even appear that this request of February 26, 1921, of the lime company, was productive of any payments by appellant, but it does appear that "in August, 1921, petitioner (appellant) prevailed upon the White Marble Lime Company to adjust the contract price to $16.25 per M ft. of lumber," and that all the shipments from lumber in pile on December 31, 1920, were settled on that basis. In other words, all of the lumber covered by the invoice of December 23, 1920, on which appellant "put through" a loss of $10 per thousand on its books, on the theory that it was to pay $35 per thousand for it, was settled for on the basis of $16.25 per thousand; so that there was, in fact, no loss at all.

Decision affirmed, with costs.

Affirmed.